# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| DAVID M. KITLEY, *derivatively on behalf of IsoRay, Inc.*, | Civil No. 16-3297 (JRT/DTS) |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| ISORAY, INC., DWIGHT BABCOCK, PHILIP J. VITALE, MICHAEL W. MCCORMICK, THOMAS LAVOY, and ALAN HOFFMANN, | |
| Defendants. | |

Shawn M. Perry, **PERRY & PERRY, PLLP**, 1660 Highway 100 South, Suite 336, Minneapolis, MN 55416, and Thomas J. McKenna, **GAINEY MCKENNA & EGLESTON**, 440 Park Avenue South, Fifth Floor, New York, NY 10016, for plaintiff.

Gregory L. Watts, **WILSON SONSINI GOODRICH & ROSATI, P.C.**, 701 Fifth Avenue, Suite 5100, Seattle, WA 98104, and Julie H. Firestone, **BRIGGS & MORGAN, PA**, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for defendants.

Plaintiff David Kitley filed this shareholder-derivative action against the former CEO of IsoRay, Inc. ("IsoRay"), Dwight Babcock, and IsoRay's four current directors: Thomas LaVoy, Philip Vitale, Michael McCormick, and Alan Hoffmann (the "Director Defendants"). Kitley's action arises under state law and includes claims for breach of fiduciary duties, gross mismanagement, and unjust enrichment. Defendants move to dismiss the Complaint. Because Kitley both lacks derivative standing and fails to

demonstrate that a demand on IsoRay's board would be futile under Minnesota law, the Court will grant Defendants' motion and dismiss.

## BACKGROUND

## I.     FACTUAL BACKGROUND

IsoRay is a Minnesota corporation whose "primary business involves developing, manufacturing, and marketing radiation 'seed' therapy used to treat cancer." (Verified S'holder Am. Derivative Compl. ("Am. Compl.") ¶¶ 2, 12, Jan. 23, 2017, Docket No. 34.)  Seed therapy allows physicians to "deliver higher doses of radiation to more specific areas of the body, compared with the conventional form of radiation therapy (external beam radiation) that projects radiation from a machine outside of the body." (*Id.* ¶¶ 24.) IsoRay supplies purified Cesium-131 "for use in low-dose radiation seed therapy." (*Id.* ¶ 2.)  Cesium-131 is a radioactive isotope of the element cesium used to treat certain cancers. (*Id.* ¶¶ 22-23, 25.)  Cesium-131 is most commonly used to treat prostate cancer. (*Id.* ¶ 2.)  According to the Complaint, IsoRay's future growth will depend on Cesium-131 being used to treat non-prostate cancers, such as lung cancer. (*Id.* ¶¶ 41-43.)

On May 19, 2015, the medical journal <u>Brachytherapy</u> published an online article about a study that evaluated using Cesium-131 seed therapy to treat lung cancer. (*Id.* ¶ 3, 68.)  The next day, before the stock market opened, IsoRay issued a press release titled "IsoRay's Cesium-131 Lung Cancer Treatment Reports 96% Success in Local Control and 100% Survival in Five Years in High Risk Patients in Newly Published Report" (the

"Press Release").[1]  (*See id.* ¶¶ 4, 90-91.)  The Press Release stated that the study showed "improved results using IsoRay's Cesium-131 seeds," that patients had "outstanding" outcomes, and that the five-year survival rate was "exceptional" for the patients that received Cesium-131 seed therapy.  (*Id.* ¶ 4.)  Then-CEO of IsoRay, Dwight Babcock, was quoted several times in the Press Release.  (*Id.* ¶ 88.)  That day, May 20, IsoRay's stock price peaked at $3.35 per share, up from $1.62 at the market's close on May 19.  (*Id.* ¶ 86, 93.)  It was also on May 20 that Kitley purchased his IsoRay shares – after IsoRay had issued the Press Release and after the market had opened.[2]

Around noon the next day, May 21, Adam Feuerstein, a writer for a financial-news website, published an online article titled "IsoRay Takes Liberties with Lung Cancer Study Results to Prop Up Drug Price."  (*Id.* ¶ 96.)  The Feuerstein article "disclosed, for the first time, that IsoRay had selectively reported the conclusions" of the Brachytherapy article, "omitting critical and material comparisons and conclusions."  (*Id.* ¶ 97.)  For

---

[1] Kitley alleges that the Relevant Period began when IsoRay issued the Press Release. (Am. Compl. ¶¶ 1, 87.)  Kitley alleges that he has been an IsoRay shareholder only "at relevant times," and not since the beginning of the Relevant Period.  (*Id.* ¶ 11; *see id.* ¶¶ 1, 109.)

[2] This sequence of events is necessarily implied by Kitley's factual allegations.  Kitley alleges that the Press Release "had an immediate effect" on IsoRay's stock price, "**opening** at $2.10 per share, or 30% higher than the prior day's closing price," and increasing "another $0.17 per share, or 8%, **in the first moment** of trading."  (Am. Compl. ¶¶ 90-91 (emphases added).)  Kitley acquired his shares on May 20.  (*Id.* ¶ 11.)  Moreover, in his briefing on Defendants' motion to dismiss, Kitley stated that he "acquired thousands of shares of IsoRay stock on May 20, 2015 (at inflated prices)."  (Pl.'s Mem. Opp. Defs.' Mot. to Dismiss at 41, Apr. 20, 2017, Docket No. 51.)  The Complaint does not suggest or imply that Kitley acquired his shares in pre-market trading.  (*See* Am. Compl. ¶ 11.)  Thus, the Complaint does not plausibly allege that Kitley acquired his shares before IsoRay issued the Press Release, and Kitley does not argue that he did.

example, treatment with Cesium-131 "demonstrated statistically equivalent rates of [tumor] control" as two other, non-Cesium-131 treatment regimes. (*Id.* ¶ 98.) That day, May 21, IsoRay's stock price peaked at $3.79 per share before Feuerstein published his article, and closed at $2.01. (*Id.* ¶ 95, 100.) At the time that Kitley filed this action, IsoRay's stock price was approximately $0.62 per share. (*Id.* ¶ 102.)

On May 28, 2015 – one week after Feuerstein published his article – IsoRay's investors filed a class-action complaint in the United States District Court for the Eastern District of Washington against Babcock and IsoRay, alleging violations of federal securities laws. Complaint, *In re IsoRay, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057 (E.D. Wash. 2016) (No. 15-5046), ECF No. 1. In June 2016, the district court denied Babcock's motion to dismiss. *IsoRay*, 189 F. Supp. 3d at 1080. The court found that the class-action complaint sufficiently alleged that the Press Release contained false and misleading statements. *Id.* at 1069-72. It also found that the class-action plaintiffs sufficiently alleged that Babcock knew that the Press Release contained false and misleading statements. *Id.* at 1078-79. While the class action was pending, Babcock resigned from all his positions with IsoRay. (Am. Compl. ¶ 13.)

The class action settled later in 2016. *See In re IsoRay, Inc. Sec. Litig.*, No. 15-5046, 2016 WL 7234807 (E.D. Wash. Oct. 20, 2016). Shortly before the parties in the class action settled, Kitley filed this shareholder derivative action. (*See* Verified S'holder Derivative Compl. ("Compl."), Sept. 29, 2016, Docket No. 1.)

## II. THE DEFENDANTS AND KITLEY'S ALLEGATIONS

When Kitley filed this action, IsoRay's board comprised one officer-director – LaVoy,[3] who was then CEO and board chair – and three outside directors: Vitale, McCormick, and Hoffmann. (Am. Compl. ¶¶ 14-17.) Also at this time, IsoRay's audit committee had three members: LaVoy, Vitale, and Hoffmann (chair). (*Id.* ¶¶ 17-18.) Vitale is a board-certified urologist who has studied prostate cancer. (*Id.* ¶ 15.) In May 2015, Babcock was IsoRay's CEO; LaVoy and Vitale were both outside directors; LaVoy was the audit-committee chair; McCormick was an audit-committee member; and neither McCormick nor Hoffmann were on IsoRay's board. (*Id.* ¶¶ 13-17.)

Kitley asserts state-law claims for breach of fiduciary duties, gross mismanagement, and unjust enrichment stemming from the Press Release and the Defendants' alleged failure to correct it. (*Id.* ¶¶ 150-164.) Kitley's allegations are effectively two-fold. First, Kitley alleges that the Defendants breached their fiduciary duties by allowing IsoRay to issue a false and misleading Press Release.[4] Second, Kitley alleges that Defendants breached their fiduciary duties by failing to maintain internal

---

[3] In the Complaint, Kitley cites to IsoRay's form 10-Q as evidence that LaVoy is **not** independent. (Am. Compl. ¶¶ 14, 124.) Defendants, in their motion to dismiss, point to IsoRay's 10-K, which states that Vitale, McCormick, and Hoffmann **are** independent. (Defs.' Mem. Supp. Mot. to Dismiss at 24-25, 25 n.10, Mar. 9, 2017, Docket No. 42.) The parties then dispute – both in their briefs and in additional briefing – whether the Court should take judicial notice of any facts in IsoRay's 10-K or 10-Q. The Court will grant Defendants' motion to dismiss irrespective of whether the Court takes judicial notice of facts outside the Complaint. Any such requests are therefore denied as moot.

[4] The Court assumes for purposes of this motion that the Press Release is in fact false and misleading.

controls over IsoRay's issuance of false and misleading statements. For both of these reasons, Kitley alleges that demand on IsoRay's board would be futile. (*See id.* ¶¶ 107-149.)

With respect to the Press Release, Kitley alleges that LaVoy and Vitale "had to know" that the Press Release was false and misleading. (*Id.* ¶¶ 122, 130, 141.) Kitley relies on their statuses in May 2015 as both outside directors and audit-committee members (and LaVoy as the audit-committee chair) to support his allegation.[5] (*Id.* ¶¶ 123-141.) With respect to internal controls, Kitley alleges that none of the Director Defendants did anything to correct the Press Release and have still done nothing to correct it. (*Id.* ¶¶ 129, 137, 140, 144, 146.) Kitley relies on their statuses as directors and audit-committee members (except for LaVoy) to support his allegation. (*Id.*) Kitley argues that the Director Defendants face liability for breaching their duty of loyalty and failing to act in good faith because they have "consciously disregarded an obligation to be reasonably informed about the business and its risks or consciously disregarded the duty to monitor and oversee the business." (Pl.'s Mem. Opp. Defs.' Mot. to Dismiss at 22, Apr. 20, 2017, Docket No. 51 (quoting *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009)).)

---

[5] The charter for IsoRay's audit committee states that it is "empowered to study or investigate any matter of interest or concern," and tasked to "[d]iscuss with management . . . the existence of any fraud . . . that involves management or other employees who have a significant role in [IsoRay]'s internal control over financial reporting." (*Id.* ¶ 19.)

DISCUSSION

## I.  STANDARD OF REVIEW

A federal court hearing an action on the basis of diversity jurisdiction applies state substantive law but federal procedural rules.  *E.g.*, *Torti v. Hoag*, __ F.3d __, 2017 WL 3528447, at *3 (8th Cir. Aug. 17, 2017).  Kitley's Complaint invokes diversity jurisdiction (Am. Compl. ¶¶ 8-9), so Federal Rule of Civil Procedure 23.1 applies to his shareholder-derivative action.  *Kanter v. Barella*, 489 F.3d 170, 176 (3d Cir. 2007); *Hockstein v. Collins*, No. 14-4020, 2015 WL 5737073, at *3 (D. Minn. Sept. 30, 2015).

Rule 23.1 "imposes a heightened pleading standard on complaints in derivative actions."  *Gomes v. Am. Century Cos.*, 710 F.3d 811, 815 (8th Cir. 2013).  It "require[s] derivative plaintiffs to satisfy more stringent pleading requirements than the notice pleading regime of Rules 8 and 12(b)(6)."  *Stepak v. Addison*, 20 F.3d 398, 402 (11th Cir. 1994); *see also In re Sonus Networks, Inc. S'holder Derivative Litig.*, 499 F.3d 47, 66 (1st Cir. 2007).

## II.  DERIVATIVE STANDING

Rule 23.1(b)(1) requires that a shareholder-derivative complaint "allege that the plaintiff was a shareholder or member at the time of the transaction complained of."  This is commonly called the "contemporaneous-ownership" rule (or "derivative standing" or

"shareholder standing").[6]  *See, e.g.*, *Bangor Punta Operations, Inc. v. Bangor & A.R. Co.*, 417 U.S. 703, 708-09, 708 n.4 (1974); *Iron Workers Mid-South Pension Fund v. Davis*, 93 F. Supp. 3d 1092, 1098 n.3 (D. Minn. 2015).  The meaning of and compliance with Rule 23.1's contemporaneous-ownership rule is a question of federal law.  *Silverstein ex rel. Tetragon Fin. Grp. Ltd. v. Knief*, 843 F. Supp. 2d 441, 444-45 (S.D.N.Y. 2012).

The contemporaneous-ownership rule "stems from the equitable nature of derivative litigation which allows a shareholder 'to step into the corporation's shoes and to seek in its right the restitution'" that the shareholder could not otherwise obtain.  *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir. 1983) (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548 (1949)).  It is "a procedural requirement which, in effect, denies a putative derivative plaintiff standing to challenge wrongdoing that predated the time the plaintiff became a shareholder."  *In re Facebook, Inc., Initial Pub. Offering Derivative Litig.*, 797 F.3d 148, 157 (2d Cir. 2015).  Accordingly, the rule prevents "the federal courts from being used to litigate purchased grievances" – claims brought by shareholders who purchased their stock after the alleged wrongdoing.  *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 531 n.6 (1984) (quoting 7A C. Wright & A. Miller, *Federal Practice and Procedure* § 1828 (1972)).

When a derivative complaint alleges as misconduct a **series** of transactions, some of which transpired before the plaintiff became a shareholder, a court must determine

---

[6] The term 'standing' here can be misleading.  Derivative standing is a requirement of Rule 23.1.  It is not a limit on the Court's jurisdiction.  *In re Facebook, Inc., Initial Pub. Offering Derivative Litig.*, 797 F.3d 148, 156 (2d Cir. 2015).

what a "transaction" is for purposes of Rule 23.1's contemporaneous-ownership requirement.

> The problem typically arises when plaintiff has acquired stock after an alleged conspiracy has commenced or a wrongful agreement has been entered into but before the plan has been completely executed. The federal courts generally have rejected the contention that the entire series of events constitutes a single transaction . . . entitling plaintiff to bring suit for injuries suffered by the corporation prior to plaintiff's acquisition of stock. Rather, plaintiff has been barred from complaining about events of this character on the theory that they assume their wrongful character as of the time of the initial event, which antedated plaintiff gaining shareholder status.

7C Charles A. Wright et al., *Federal Practice and Procedure* § 1828 (3d ed. 2017). Accordingly, "to invoke derivative standing pursuant to Federal Rule of Civil Procedure 23.1 . . . , a plaintiff must have owned stock in the corporation **throughout** the course of the activities that constitute the **primary basis** of the complaint." *In re Bank of N.Y. Derivative Litig.*, 320 F.3d 291, 298 (2d Cir. 2003).

A plaintiff that fails to meet the contemporaneous-ownership requirement of Rule 23.1 may invoke the "continuing wrong" or "continuing harm" doctrine. That doctrine allows a plaintiff who acquired stock after the transaction complained of "to maintain a derivative suit on the theory that the alleged 'wrong' commenced before the stock acquisition but was continuing and not executed and final until sometime after" the

plaintiff's stock acquisition. *Brambles USA, Inc. v. Blocker*, 731 F. Supp. 643, 649 (D. Del. 1990).[7]

Federal courts often hold that the continuing-wrong theory fails to satisfy Rule 23.1's contemporaneous-ownership requirement.[8]  For example, the court in *In re Omnivision Technologies, Inc.* rejected plaintiffs' invocation of the continuing-wrong doctrine for "a series of allegedly false press releases and financial filings" made before plaintiffs became shareholders.  Nos. 04-2297, 04-2443, 04-2518, 2004 WL 2397586, at *2 (N.D. Cal. Oct. 26, 2004).  The court dismissed the complaint for lack of derivative standing, even though Omnivision, announced that it "was carrying out a review of previously released financial results" after the plaintiffs became shareholders, thereby damaging investors' confidence in Omnivision and leading to a "sharp sell-off in its stock." *Id.* at *1.

Here, Kitley does not allege that he owned IsoRay shares throughout the Relevant Period.  Instead, to satisfy Rule 23.1's contemporaneous-ownership requirement, Kitley relies on the continuing-wrong doctrine.  To support his continuing-wrong theory, Kitley alleges that IsoRay lacked (and continues to lack) internal controls related to the issuing of false and misleading statements.  But the only IsoRay statement that Kitley alleges is

---

[7] Some courts characterize the continuing-wrong doctrine as an exception to the contemporaneous-ownership rule, while others characterize it as an expansive definition of "transaction" in Rule 23.1.  *Bank of N.Y.*, 320 F.3d at 298.

[8] *See* 7C Charles A. Wright et al., *Federal Practice and Procedure* § 1828 n.20 (3d ed. 2017) (collecting cases).

false and misleading is the May 20 Press Release. The core of Defendants' allegedly wrongful conduct is the issuance of the May 20 Press Release – which occurred before Kitley became a shareholder. Thus, Kitley fails to allege that he owned IsoRay shares "**throughout** the course of the activities that constitute the **primary basis**" of his complaint. *Bank of N.Y.*, 320 F.3d at 298.

Because Kitley lacks derivative standing as Rule 23.1 requires, the Court will grant Defendants' motion and dismiss Kitley's Complaint. But even if Kitley had derivative standing, the Court would still dismiss the Complaint for failure to demonstrate demand futility.

## III. DEMAND FUTILITY

Rule 23.1 requires the plaintiff to allege "with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors . . . and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). Rule 23.1 "requires that the complaint . . . allege the facts that will enable a federal court to decide whether such a demand requirement has been satisfied." *Gomes*, 710 F.3d at 815 (quoting *Halebian v. Berv*, 590 F.3d 195, 211 (2d Cir. 2009)). "When a plaintiff pursues derivative claims arising under state law without making a pre-suit demand, a federal court must apply state law to determine whether demand is excused." *Id.* IsoRay is a Minnesota corporation, Kitley's claims arise under state law, and Kitley did not make a pre-suit demand. So Minnesota law applies in determining whether Kitley's demand on

IsoRay's board would have been futile.  *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991).

A.       **Minnesota Law of Demand Futility**

Prior to bringing a derivative action on behalf of a corporation, a plaintiff is ordinarily required to make a demand on the corporation's board of directors.  *See, e.g.*, *Winter v. Farmers Educ. Coop. Union of Am.*, 107 N.W.2d 226, 233 (Minn. 1961).  The Minnesota Supreme Court has long stressed the importance of a shareholder's demand on the board of directors:

> The demand upon the managing directors and shareholders is important in that it gives the management of the corporation an opportunity to consider the merits of the dispute and to determine, in the interests of the corporation and shareholders, whether it might be disposed of without the expense and delay of litigation.  The demand requirement as a condition precedent to a shareholder's derivative suit is one not lightly to be dispensed with.

*Id.*  More recently, the Minnesota Supreme Court elaborated on the value of the demand requirement:

> The substantive decision about whether to pursue the claims advanced in a shareholder's derivative action involves the weighing and balancing of legal, ethical, commercial, promotional, public relations, fiscal and other factors familiar to the resolution of many if not most corporate problems.
>
> The careful balancing of those factors is best done by the board of directors, which is familiar with the appropriate weight to attribute to each factor given the company's product and history.

*Janssen v. Best & Flanagan*, 662 N.W.2d 876, 883 (Minn. 2003) (citation and internal quotation marks omitted).

Nonetheless, the demand requirement is excused "where it is plain from the circumstances that it would be futile." *Winter*, 107 N.W.2d at 234. This is a "stringent" test. *In re Medtronic, Inc. Derivative Litig.*, 68 F. Supp. 3d 1054, 1063 (D. Minn. 2014). Despite the parties' invocation of Delaware law, the Court must adhere to the principles outlined by the Minnesota Supreme Court in *Winter*. *See Reimel v. MacFarlane*, 9 F. Supp. 2d 1062, 1067 (D. Minn. 1998). The *Winter* court stated that "a demand should be made on the board of directors unless the wrongdoers constitute a majority of the board[.]" 107 N.W.2d at 233. *Winter* did not, however, adopt a per se rule that demand is excused "whenever a majority of the board is accused of wrongdoing," because such a rule would allow a plaintiff to circumvent the demand requirement irrespective of the strength of the allegations against the directors. *Markewich ex rel. Medtronic, Inc. v. Collins*, 622 F. Supp. 2d 802, 807-08 (D. Minn. 2009). Rather, "[t]he derivative suit is recognized as an extraordinary remedy available to the shareholder as the corporation's representative only when there is no other road to redress." *Winter*, 107 N.W.2d at 233 (internal quotations omitted). Thus, demand is futile only when a plaintiff demonstrates that the board of directors is "so conflicted that there existed no possibility that it would respond to a demand or that any such response would have been preordained." *In re Patterson Cos., Inc. Sec., Derivative & ERISA Litig.*, 479 F. Supp. 2d 1014, 1039 (D. Minn. 2007). "The critical question is whether plaintiff has shown that the board was somehow so conflicted that it could not have properly responded to a demand that it address the allegations of mismanagement and wrongdoing." *In re Xcel Energy, Inc.*, 222 F.R.D. 603, 607-08 (D. Minn. 2004).

A Minnesota corporation's ability to use a special litigation committee ("SLC") further supports this stringent standard. Minnesota law allows the board of a Minnesota corporation to appoint an SLC "to consider legal rights or remedies of the corporation and whether those rights and remedies should be pursued." Minn. Stat. § 302A.241, subd. 1. An SLC "enable[s] a corporation to dismiss or settle a derivative suit despite a conflict of interest on the part of some **or all directors**." *In re UnitedHealth Grp. Inc. S'holder Derivative Litig.*, 754 N.W.2d 544, 550-51 (Minn. 2008) (emphasis added). An SLC may consist of "one or more independent directors **or other independent persons**," and the SLC's authority is not subject to the board's direction and control. Minn. Stat. § 302A.241, subd. 1 (emphasis added). In light of section 302A.241, "showing that demand would be futile is . . . [exceedingly] difficult under Minnesota law."[9] *Medtronic*, 68 F. Supp. 3d at 1061 (quoting *La. Mun. Police Emps. Ret. Sys. v. Finkelstein*, No. 27-cv-11-23986, at *8, 2012 WL 10057353 (Minn. Dist. Ct. May 29, 2012)) (alterations in original). A derivative plaintiff must demonstrate "that the Board was so self-interested or conflicted that no possibility existed that it would respond to the demand request." *Id.* at 1063.

---

[9] At least one other state similarly holds that a statutory provision that allows for nonboard members to serve on an SLC – just like Minnesota's section 302A.241 – almost "eliminates the need for any doctrine defining what adequately excuses making a demand." *In re Guidant S'holders Derivative Litig.*, 841 N.E.2d 574-75 (Ind. 2006) (citing Ind. Code § 23-1-32-2); *see also Boland v. Engle*, 113 F.3d 706, 712-13 (7th Cir. 1997).

Kitley does not dispute the applicability of Minnesota law. Instead, he argues that demand is futile in Minnesota if a derivative plaintiff satisfies the test articulated in the Delaware case of *Rales v. Blasband* – that demand is futile if a derivative plaintiff "alleges particularized facts creating a reasonable doubt that a majority of the Board would be disinterested or independent in making a decision on a demand." 634 A.2d 927, 930 (Del. 1993).

*Rales* might be the law of Delaware, but it is not the law of Minnesota. "Delaware and Minnesota law differ with respect to the requirements for demonstrating demand futility." *Medtronic*, 68 F. Supp. 3d at 1062. In fact, "Minnesota courts have specifically refused to 'adopt blindly' the Delaware approach [to demand futility] as doing so in certain situations would be 'at odds with general principles of Minnesota law.'" *Haberle ex rel. Gander Mountain Co. v. Baker*, No. 05-315, 2005 WL 2105543, at *3 (D. Minn. Aug. 30, 2005) (quoting *Reimel*, 9 F. Supp. 2d at 1067 n.7). The existence of section 302A.241, subdivision 1 further makes clear that *Rales* is not the law of Minnesota because even if all directors are interested or conflicted, a Minnesota corporation may still employ an SLC that consists entirely of nonboard members.[10]

Kitley fails to demonstrate that demand on IsoRay's board would be futile. At the outset, Kitley fails to show why demand would be futile given IsoRay's option to use an SLC pursuant to section 302A.241 – an SLC that could be comprised entirely of

_____

[10] Delaware corporations, unlike Minnesota ones, may not appoint nonboard members to an SLC. *See* Del. Code Ann. tit. 8, § 141(c).

independent nonboard members.[11]  That failure alone likely requires dismissal.  *See Medtronic*, 68 F. Supp. 3d at 1063.  But Kitley also fails to demonstrate that his allegations against the Director Defendants are so inculpatory as to make the Defendant Directors so self-interested or conflicted that there is no possibility that they would respond to Kitley's demand.  *Medtronic*, 68 F. Supp. 3d at 1063.

Although Kitley argues that the Director Defendants' potential liability renders demand futile under *Rales*, the Court will nevertheless consider and evaluate Kitley's arguments, but under Minnesota's more stringent test.  Kitley contends that demand is futile because the Director Defendants are not independent because they face liability for breaching their fiduciary duties by allowing IsoRay to issue a false and misleading Press Release and by failing to maintain internal controls.

## B.     The Press Release

Kitley alleges that the Director Defendants face liability for breaching their duty of loyalty by allowing IsoRay to issue the Press Release that the Director Defendants knew to be false and misleading.  Kitley offers no direct evidence or particularized allegations that any of the four Director Defendants knew that the Press Release was false or

---

[11]  Kitley ignores the availability of an SLC – arguing instead that he need only demonstrate that demand would be futile under *Rales*.  As stated, *Rales* is not the law in Minnesota.  But even if it were, the Court would find that Kitley has failed to demonstrate that demand would be futile under *Rales*'s less stringent standard.  For the same reasons that Kitley has failed to demonstrate that the Director Defendants are "so self-interested or conflicted" that they would not respond to Kitley's demand, *Medtronic*, 68 F. Supp. 3d at 1063, Kitley fails to allege "particularized facts creating a reasonable doubt that a majority of the Board would be disinterested or independent in making a decision on a demand," *Rales*, 634 A.2d at 930.

misleading when IsoRay issued it. Instead, Kitley argues that the Complaint supports such a reasonable inference because the Press Release related to IsoRay's core operations and because of the Director Defendants' positions on the audit committee.

First, the core-operations theory does not suffice for Kitley to impute knowledge about the Press Release to the Director Defendants. Some courts, particularly in the securities-fraud context, have held that knowledge of facts critical to a company's core business operations can be imputed to a company's top **officers**. *See In re Forest Labs., Inc. Derivative Litig.*, 450 F. Supp. 2d 379, 391 (S.D.N.Y. 2006) (compiling cases). Indeed, the court in the securities class action imputed such knowledge to at least one officer: IsoRay's then-CEO, Babcock. *IsoRay*, 189 F. Supp. 3d at 1079. But only in rare cases has a core-operations theory been applied to outside **directors**. *Kococinski v. Collins*, 935 F. Supp. 2d 909, 921-22 (D. Minn. 2013).

Here, even assuming that Cesium-131 is IsoRay's core business, "it cannot follow that every fact pertaining to [Cesium-131] may reasonably be imputed to Outside Directors." *Forest Labs*, 450 F. Supp. 2d at 393. The critical issue in this case is timing. IsoRay issued the Press Release the day after Brachytherapy published the journal article that was the subject of the Press Release. None of Kitley's allegations suggest that any of the Director Defendants were, in May 2015, involved in issuing press releases on this sort of quick timeframe – a quintessential day-to-day operation of officers and managers on

which outside directors are entitled to rely.[12]  *Kococinski*, 935 F. Supp. 2d at 921-22; *Markewich*, 622 F. Supp. 2d at 811; *see* Minn. Stat. § 302A.251 subd. 2.  Moreover, the Press Release concerned Cesium-131's experimental use for treating lung cancer, not for treating prostate cancer – the latter of which is Cesium-131's most common use.  Thus, the Complaint does not support an inference that the Director Defendants knew that the Press Release was false and misleading.[13]

Second, the Director Defendants' positions on the audit committee do not support a reasonable inference that they knew that the Press Release was false and misleading. Kitley does not provide a particularized allegation about the audit committee's knowledge.  Rather, he relies on excerpts from the committee's charter to demonstrate that the committee members had knowledge.  But committee membership alone cannot support a reasonable inference of knowledge on the part of an outside director.  *See Markewich*, 622 F.Supp.2d at 811.  In the absence of more direct and particularized allegations, the Complaint does not support a reasonable inference that the committee

---

[12] To the extent that Kitley relies on Vitale's status as a board-certified urologist to impute knowledge of the Press Release to him, Kitley's allegations still fail because Kitley does not demonstrate that Vitale was involved in IsoRay's day-to-day operations.

[13] The court's finding in the securities class action that the Press Release was false and misleading does not compel a finding here of knowledge by IsoRay's outside directors.  That action involved the knowledge of Babcock and IsoRay as a corporation – not the knowledge of IsoRay's outside directors.  *IsoRay*, 189 F. Supp. 3d at 1075-79.

members actually knew that the Press Release was false and misleading.[14]  *See Xcel Energy*, 222 F.R.D. at 607.

The Director Defendants' potential liability related to the May 20 Press Release does not render demand futile.

### C.    Internal Controls

Kitley alleges that the Director Defendants face liability for breaching their duty of loyalty and failing to act in good faith because they consciously disregarded an obligation to be reasonably informed about the business and its risks or consciously disregarded the duty to monitor and oversee the business.  These allegations stem from the Press Release, but they fail to demonstrate that IsoRay's board is so conflicted or disinterested that it is unable or unwilling to consider Kitley's demand.

Kitley's allegations stemming from the Director Defendants' purported failure to correct the Press Release (and to prevent the issuance of other false and misleading statements) are essentially failure-of-oversight claims, which Kitly frames as breaches of the duty of loyalty and good faith – not as breaches of the duty of care.  To prevail, a plaintiff must demonstrate that the directors acted with "bad faith or conscious disregard," which is a higher standard than the gross-negligence standard that applies in duty-of-care cases.  *Iron Workers Mid-South Pension Fund*, 93 F. Supp. 3d at 1104-05;

---

[14] Kitley's allegations fail even to establish that the committee members **should have known** that the Press Release was false and misleading at the time it was issued because – like the outside directors – nothing in the Complaint suggests that the audit committee members were involved with issuing press releases on a day-to-day basis.

*Kococinski*, 935 F. Supp. 2d at 917-18. Again, Kitley alleges no facts directly showing that the Director Defendants consciously disregarded their job duties. So the alleged facts must support such an inference.

Other than the Press Release, Kitley alleges no other false statements, failures, or red flags that can support the inference that any Director Defendant consciously disregarded their duties. After Feuerstein published his article (and after the securities class action), it is unclear what the Director Defendants should have corrected.

The Director Defendants' potential liability related to their alleged failure to maintain internal controls does not render demand futile.

Kitley has not shown that there is "no possibility" that the Director Defendants would respond to Kitley's demand "or that any such response would have been preordained."[15] *Patterson*, 479 F. Supp. 2d at 1039. Because Kitley fails to demonstrate that demand on IsoRay's board would be futile, the Court will grant Defendants' motion and dismiss Kitley's Complaint.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss [Docket No. 40] is

---

[15] The Court does not hold that Minnesota is a universal demand jurisdiction. *See Medtronic*, 68 F. Supp. 3d at 1063. But Kitley has failed to demonstrate demand futility under the facts alleged. "A direct pilfering of corporate assets, for example, might present a different case." *Boland*, 113 F.3d at 713.

**GRANTED**, and the Amended Complaint [Docket No. 34] is **DISMISSED with prejudice**.

      **LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  October 19, 2017             _____s/John R. Tunheim_____
at Minneapolis, Minnesota.             JOHN R. TUNHEIM
                                        Chief Judge
                           United States District Court